### CORNING GLASS WORKS v. NATIONAL LABOR RELATIONS BOARD et al.
No. 6, Oct. Term 1940.

Circuit Court of Appeals, Second Circuit.
July 11, 1942.

Joseph M. Hartfield, Thomas Kiernan, and White & Case, all of New York City, and John C. Bane, Jr., Seward H. French, Jr., and Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., for Corning Glass Works.

Robert B. Watts, Gen. Counsel, Malcolm F. Halliday, Asst. Gen. Counsel, and Gerhard P. Van Arkel and Norman F. Edmonds, all of Washington, D. C., for National Labor Relations Board.

Before CHASE, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

■ 1. In Corning Glass Works v. N.L.R.B., 2 Cir., 118 F.2d 625, we sustained the Board's order and shortly thereafter entered a decree enforcing it. Subsequently, the Board appeared here, alleging non-compliance by the company with our decree, and asked for a contempt order. We then referred the issues to a special master. He has made findings of non-compliance. The Board asks our confirmation of his report, and the company excepts to it. We have heard argument and now confirm the report of the able master in all respects. In particular, the master made findings as to deductions from back pay because of (a) actual past earnings of certain of the discharged employees and (b) earnings which certain employees might have made had they not refused to accept reemployment by the company in positions alleged to be equivalent to those from which they were unlawfully discharged. The master correctly found that there was no such equivalence where a reinstatement or an offer thereof was not coupled with seniority rights.

■ 2. The master refused to hear evidence as to, or to pass upon, the propriety of deductions because of the alleged wilful or neglectful failure of certain employees to accept employment from other employers. In so refusing, he was correct, as it was plain from our order of reference and the record that that issue was not properly before him.

3. The company contends that, if that is true, that issue should now be referred to the Board for hearing and decision. The Board contends that this request comes too late. The peculiar state of the record becomes important:

■ (a) The Board's order was entered, after a hearing, on September 22, 1939. During the hearing before the Board, the company did not raise the present issue as to potential earnings from other employers. That issue is, therefore, not open so far as it relates to such potential earnings up to the date of the close of the Board's hearing. The question here is whether it is also foreclosed for the subsequent period.

(b) On September 27, 1939, the company petitioned this court to review and set aside the Board's order; the Board, by cross-petition, asked its enforcement.

(c) On or about January 5, 1940, the company moved this court for leave to adduce additional evidence as to matters occurring after the Board's hearing; the alleged matters related to actual employment obtained by some of the employees and to offers by the company to reinstate others. The Board answered that these were mat-

ters to be considered in compliance proceedings after this court had entered its decree. This court, on January 30, 1940, without opinion, denied the company's motion.

(d) On the petition to review and the cross-petition to enforce the Board's order, the company's brief was filed July 12, 1940; the Board's brief on August 22, 1940; and the company's reply brief on October 30, 1940. Oral argument was heard November 7, 1940.

On April 4, 1941, this court filed an opinion holding that with certain modifications, the Board's order should be enforced. See 2 Cir., 118 F.2d 625. That order (which, in that respect, we held was not to be modified) provided that certain employees, discharged in violation of the act, should be reinstated with back pay less their net earnings. The opinion said that certain matters (i. e., essentially those referred to in the company's motion to take additional evidence) should be considered as a defense to a contempt proceeding for non-compliance.

■ Up to this point, the company had said nothing as to potential earnings from potential employment by other employers. The issue as to such potential earnings for the period before the close of the Board's hearing was, as we have said, foreclosed. The Board insists that for any subsequent period it is now also foreclosed, because the company had not raised that issue in its petition or motion or briefs thus far filed with this court. With that argument, we do not agree for these reasons:

In Phelps Dodge Corporation v. N.L.R.B., 2 Cir., July 11, 1940, 113 F.2d 202, 206, this court, on a petition to enforce, modified the Board's order to require deduction from back pay of potential earnings from other employers. This decision was rendered the day before the company's brief in the instant case was filed.

In N. L. R. B. v. Yale & Towne Mfg. Co., 2 Cir., August 16, 1940, 114 F.2d 376, the company, immediately after the issuance of the Board's order, had moved the Board to reopen the record to adduce evidence as to matters occurring subsequent to the Board's hearing; according to an affidavit filed in support of this motion, certain of the employees had, in that interval, been re-employed by the company. The Board denied this motion. This court, in its enforcement decree, modified the Board's order to allow for consideration of such subsequent events.[1]

But, as soon appeared, we took that action because of the exceptional facts in that case: In N. L. R. B. v. Acme Air Appliance Co., 2 Cir., February 3, 1941, 117 F.2d 417, 421, the Board, in its brief filed in this court, on petition to enforce its order had urged that our ruling in the Yale & Towne case was erroneous, that such matters related solely to compliance, and that they should, therefore, be dealt with by the court only in connection with a later proceeding to punish for contempt for non-compliance with the court's enforcing decree. In the Acme Air Appliance case, this court refused to follow the Yale & Towne case, but distinguished it because of its peculiar facts, and said: "If subsequent or unproved events furnish a defense in whole or in part to the enforcement of the * * * provisions of the order for reinstatement and back pay, such a defense cannot affect the validity of the order itself, which speaks as of the time of the hearing and is founded upon the record before the Board. Such defenses * * * may be interposed to a motion by the Board to punish a refusal to obey an order of this court to enforce the Board's order for reinstatement and back pay * * *." True, in the Acme Air Appliance case, the defenses did not relate to potential employment with other employers. But, until, subsequently—on April 28, 1941, more than three weeks after our opinion in the instant case was filed—the Supreme Court decided Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217, it had not been ruled that such a defense was to be differentiated in treatment from the kind of defenses discussed in the Acme Air Appliance case.

The company in the instant case, when writing its briefs and arguing orally, had good reason, therefore, to believe that the defense of potential earnings from other employers could not properly be raised in a court hearing on petitions to review or enforce a Board's order. Consequently, the company appropriately did not present that

---

[1] This was more than a month after the company's brief in the instant case was filed. It was some two months before its reply brief was filed. But the Board was at that time contending, in the Acme Air Appliance case, that this court had erred in the Yale & Towne case; and, not long after, we held that our action in the Yale & Towne case was highly exceptional.

issue in its argument before this court in connection with its petition to review the Board's order and the Board's cross-petition to enforce it.

(e) On April 21, 1941, the company tendered to this court a proposed form of decree, which provided for a deduction from the back pay of each of the discharged employees such "amounts as he would have earned during such period had he accepted such other work as an employee of ' * * * any other employer, as he was fitted to do, and as was reasonably available to him." That provision went back too far in time, as it covered the period before the close of the Board's hearing. But it was otherwise properly worded under our earlier decision in Phelps Dodge (which the company cited in an accompanying memo) and squarely included the issue of potential earnings which we are now considering. It was not in line with our earlier decision in the Acme Air Appliance case.[2]

(f) Without opinion, this court (in line with its decision in the Acme Air Appliance case) rejected this provision and, on April 29, 1941, entered an enforcement decree calling for deduction of "net earnings."

(g) On April 28, 1941, the Supreme Court had filed its opinion in Phelps Dodge Corporation v. National Labor Relations Board, supra, in which it said that the deductibility of amounts which employees unjustifiably refused to earn in desirable new employment was a matter which should be referred to and decided by the Board and which should not be determined in contempt proceedings.

It may well be that this court had not read that opinion when, the day before, its enforcing decree was entered. Had that opinion then been carefully considered, the decree should have contained the provision sought by the company, coupled with a further provision that that issue be referred to the Board.

■ (h) On May 12, 1941, the company moved this court to resettle its enforcing decree of April 29, 1941. It asked for the inclusion in the decree of a provision remanding the proceedings to the Board, with directions to hold a hearing to determine which of the discharged men "the petitioner shall be required to make whole * * * if any, and the amount due each of them for such reimbursement." In an accompanying memo, it said that it sought to have this issue determined in a formal hearing before the Board, rather than in connection with a contempt proceeding.[3]

The Board now asserts that, by this motion of May 12, 1941, the company had abandoned the issue as to potential earnings from other employers which it had raised on April 21, 1941. We do not agree. The company may have been hesitant again to press that issue with which this court on April 29 (less than three weeks earlier) had refused to deal, despite the Supreme Court's Phelps Dodge decision filed on April 28. To be sure, the provision tendered by the company on April 21, had not asked for a reference of that issue to the Board. But the company may reasonably have concluded that, if that were this court's sole objection to the provision which the company then tendered, this court would have accepted that provision with a modification necessary to send it to the Board. It is unfair to say that, in the circumstances, the company, by its motion of May 12, abandoned the issue which it had pressed on April 29. Cf. In re Barnett, 2 Cir., 124 F.2d 1005.

However that may be, this court, without opinion, on May 16, 1941, denied the company's motion of May 12, 1941.

(i) On October 28, 1941, the Board, alleging violation of our enforcement decree of April 29, 1941, asked this court to hold the company in contempt. The company then, on November 18, 1941, asked that, in our order of reference to the special master, we provide that he should consider to what extent the employees had wilfully

---

[2] Because it included matters occurring after the close of the Board's hearing which, in the Acme Air Appliance case, we had said should be postponed for consideration in a compliance proceeding.

[3] The Board answered this motion, saying that there should be no such reference to the Board as the company sought in its motion, the issues therein referred to being, said the Board, matters to be considered in a contempt proceeding. It went on to say: "In such a proceeding, the Board and the employer are in an adversary relation. If the Board proceeded to make findings of compliance, there is nothing in the statute which would entitle such findings to greater weight than the statements of any other litigant. The Board has no power to determine what constitutes compliance with the decree of this court."

failed or neglected to accept employment from other employers.

Our order of January 6, 1942, referring the matter to the master, omitted that requested provision; and correctly so, as, under the Supreme Court's Phelps Dodge decision, that was an issue to be referred to the Board and not to a master. But we might well, at that time, have referred it to the Board.

■ 4. The result of our order of reference was that the master, properly, rejected evidence bearing on the issue of potential employment by other employers. But the consequence is that the company has not had an opportunity to be heard thereon to any extent whatever. We conclude that, under the Supreme Court decision in Phelps Dodge, that matter should long ago have been referred to the Board for decision and hearing.

5. It is suggested that that conclusion is erroneous because the company failed to seek certiorari from the decree of April 29, 1941. We reject that suggestion. Cf. Simmons Co. v. Grier Bros. Co., 258 U.S. 82, 91, 42 S.Ct. 196, 66 L.Ed. 475; Messinger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152; Riehle v. Margolies, 279 U.S. 218, 220, 49 S.Ct. 310, 73 L.Ed. 669; Cadillac Motor Car Co. v. Johnson, 2 Cir., 221 F. 801, L.R.A.1915E, 287, Ann. Cas.1917E, 581.

■ 6. It is also suggested that that decree was correct because the company, on April 21, 1941, should have made a showing that there was reasonable ground for believing that the company would be able to prove that their employment by other employers was available. Having due regard to the unique record in this case, we cannot agree. It is unique for several reasons:

The procedure was then unsettled and confusing. Our decision in Acme Air Ap-

pliance indicated that such an issue should be considered in contempt proceedings. The propriety of deductions from back pay because of such potential employment was not finally decided until the Supreme Court decided the Phelps Dodge case. The regrettable delay in referring this issue to the Board was apparently due to confusion resulting from the recency of that decision at the time when our enforcement order was entered. In the unusual circumstances, we cannot say that the company was dilatory or inadequately precise in pressing the issue as to potential employment for the period after the close of the Board's hearing. Nor can we say that the long delay, since the major labor dispute involved in this case arose in 1937, is in any considerable part ascribable to the company.[4]

7. However, our decision here—to send this matter to the Board at this late date—should not be regarded in any way as a controlling precedent in other cases for these reasons:

It is true that, in proper circumstances, the continuing nature of a back-pay order may call for adjustment because of new facts which have occurred after the conclusion of the Board's hearing which led to the entry by the Board of such an order.[5] We recognize that such adjustments may entail delays and other difficulties. But those delays and other difficulties were explained in the opinion of the dissenting Justices in the Phelps Dodge case,[6] and were held, in the majority opinion, to be insufficient to cut off a right of reference to the Board to consider adjustments due to circumstances occurring after the close of the Board's hearing on enforcement. The desirability of avoiding those delays and other difficulties cannot therefore be considered by us.

However, as the doctrine of the Phelps Dodge case is now known to everyone, we shall, in other cases, require a prompt and clear showing of probable evidence, bear-

---

[4] There is nothing of record showing that the following delays were ascribable to the company:

(a) From January 25, 1938, when the Board issued its complaint, until September 22, 1939, when the Board's order was entered.

(b) From September 27, 1939, when the company's petition to review that order was filed here, until April 4, 1941, when this court's opinion was filed.

(c) From October 28, 1941, when the Board filed its contempt petition, until January 6, 1942, when this court referred the issues to the Master.

[5] Similar need for adjustment, because of changed circumstances, may arise in connection with an injunction decree (United States v. Swift & Co., 286 U.S. 106, 114, 115, 52 S.Ct. 460, 79 L.Ed. 999) or a decree for alimony (19 C.J. 273ff; 27 C.J.S., Divorce, § 239).

[6] See 313 U.S. 177, 200, 206-208, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217.

ing on such an issue—or an adequate excuse for not so showing—before we hold that it is open and that it must be considered by the Board.

Moreover, it is obviously awkward to split the issue of "equivalent employment," sending to the Board so much of it as relates to potential employment by other employers and sending to a master so much of it as relates to actual or potential employment by the respondent-employer. In future cases, where the issue of potential employment with other employers is raised, we shall need to consider whether such awkwardness should not be avoided by referring to the Board the entire issue of "equivalent employment" (although the Board is apparently reluctant to hear such issues when they go beyond the requirements of the Phelps Dodge decision).[7] However, as the Board in this case is asking confirmation of the master's report, we do not here pass on that question.

■■ 8. The company, in its offer of proof before the master, asserted that there were opportunities for other employment beginning not earlier than January, 1940. The amounts found due by the master up to January, 1940, must, therefore, be forthwith paid, with interest, and without further deductions.

For the period beginning January, 1940, we shall enter a conditional order for the amounts found due by the master, with interest. But from the amount due any employee under the conditional order, there shall be deducted such amount, if any, as the Board may find should have been earned in the employ of persons other than the company.

■■ 9. The Board, in passing on the amounts, if any, which should thus have been earned, will, of course, be governed by the Phelps Dodge decision [313 U.S. 177, 61 S.Ct. 855, 85 L.Ed. 1271, 133 A.L.R. 1217]. Thus, for instance, the Board need not regard "remote and speculative claims" made by the employer as to such earnings; and the governing principle is "not so much the minimization of damages as the healthy policy of promoting production and employment." The Board need not apply "abstractly" the doctrine of mitigation of damages without regard to the basic policy of the statute. The Board has a "wide discretion" on this issue. "The board * * * does not exist for the 'adjudica-

tion of private rights'; it 'acts in a public capacity to give effect to the declared public policy of the Act to eliminate and prevent obstructions to interstate commerce by encouraging collective bargaining.'" For to limit its consideration "merely to questions of monetary loss to workers would thwart the central purpose of the Act, directed as that is toward the achievement and maintenance of workers' self-organization." In those and like words, the Supreme Court, in Phelps Dodge, described the wide discretion of the Board on such an issue. We take it to mean that the strict rules relating to mitigation of damages in ordinary discharged-employee cases are not applicable. Without limiting the generality of what we have said, the Board, in deciding whether any of the employees wilfully or negligently failed to seek a position with another employer, may properly take into account what would have been the effects on that employee's seniority privileges if he had accepted other employment.

The report of the special master is confirmed subject only to the conditions described in this opinion. The master's statement of expenses, disbursements and his bill for services are approved. The case is remanded to the Board for the limited purposes above noted.

CLARK, Circuit Judge (dissenting in part).

I think the master's report should be accepted in its entirety, and that no equities have been shown justifying remand to the Board for further delay in these already overlong proceedings. This is a labor dispute which came to a head in the spring and summer of 1937. The Board's decision was two years later. Our own enforcement decision was nearly two years after that (April 4, 1941). Though our order was entered April 29, 1941, petitioner has been dilatory in complying with it; even the required notices were not posted until November 29, 1941, after contempt proceedings were instituted. Petitioner today still owes its discharged employees a large sum for back pay—about $27,000, as the master found. Of this, the amount now ordered held back is only a small part, and is obviously but a fraction of petitioner's expenses in carrying on this long and fruitless litigation. Its petition for review really sought a relitigation of issues of

---

[7] See the Board's position quoted above in note 3.

fact, as our decision in 118 F.2d 625 demonstrates, and thus was foredoomed to failure from the beginning.[1] So also, I think it clear, is its present attempt to prolong the dispute. Surely at some time there should come an end to the possibilities for futile attack on labor orders. Judicial decrees, delayed for five years or more, cannot allay labor unrest; they may, indeed, increase it.

The limitations of the remand and the burden which the petitioner will have in meeting its terms demonstrate, I believe, that this decision is basically an attempt to be overscrupulous, to lean over backwards, in granting official review of even what has been only most barely claimed. The attack on the administrative agencies, which has now shifted from the legislative policy itself to the more successful front of extensive judicial review, has tended to paralyze both agencies and courts and to stop them from taking forthright and prompt steps to enforce the laws committed to their keeping. Unfortunately, no one is at hand to press the public need of speedy enforcement of these laws, if enforcement is to be worthy of the name at all. The loss, and even danger, to the public interest of this course has been brought home to all by the crisis of war, wherein an entirely new administrative setup and a new board have been found necessary in order to achieve peaceful and productive labor relations with that celerity which was denied the old board.

It is well settled that on contempt proceedings the original order is not subject to attack, Oriel v. Russell, 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419; United States ex rel. Emanuel v. Jaeger, 2 Cir., 117 F.2d 483, and cases cited; and the Supreme Court in Phelps Dodge Corp. v. N. L. R. B., supra, pointed out that any claim of willfully incurred nonemployment should be settled by the Board before contempt proceedings. Hence we must hold that the master acted correctly under the existing orders of our court; the only way we can now proceed to consider this issue is by reopening the original enforcement order. The National Labor Relations Act, which in § 10(i), 29 U.S.C.A. § 160(i), directs that petitions under the Act shall be heard "expeditiously" and, if possible, within ten days, provides in § 10(e), 29 U.S.C.A. § 160(e), that new objections shall be raised before the court only under "extraordinary circumstances." I think, therefore, that before we reopen the original order at this late date, we should have a strong showing of the equity and justice of the course, together with some indication of petitioner's probable success in the new proceedings. Neither is shown here. That is why the case is so strikingly different from the situation disclosed in Phelps Dodge Corp. v. N. L. R. B., supra. There the matter came up and was presented in the original hearings of the Board; moreover, there was tangible evidence that the former employees had actually taken other jobs which later they had given up. Here the long delay of petitioner in making anything more than the most perfunctory legal claim on this issue, coupled with a lack of showing of any good basis upon which the Board should modify its order, should require us to refuse the remand. N. L. R. B. v. Baldwin Locomotive Works, 3 Cir., 128 F.2d 39, 50; N. L. R. B. v. Condenser Corp., 3 Cir., 128 F.2d 67, 78; Southport Petroleum Co. v. N. L. R. B., 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. ——.

First, as to delay, it is indisputable that nothing remotely approaching a factual showing of the claimed willfullness was ever offered prior to the master's hearing in February of this year; also that no explicit request for a remand to the Board—the course so definitely required under the Phelps Dodge decision—was made, as to the matter now in issue, before the limited alternative suggestion to that effect contained in the "Exceptions" to the master's report, filed June 17, 1942, on the hearing of the pending motion. Moreover, there was not even a suggestion of this issue until petitioner on April 21, 1941, after our enforcement decision, presented a counter-order to that offered by the Board and supported it with a memorandum. Before that time petitioner had stressed only the two issues which, indeed, it has continuous-

---

[1] True, the court, following its lengthy discussion of the factual issues, did summarily direct modification of the Board's order with respect to reimbursement of union dues deducted from employees' wages and of Public Relief Agencies for wages paid, as well as with respect to the form of notices to be posted, page 630 of 118 F.2d; but these modifications were all required by well-settled precedents in this circuit and obviously could have been secured without the appeal on the facts.

ly stressed ever since, namely, its own offers of re-employment and the actual earnings of the men after discharge. In its memorandum on the counter-order it again emphasized these two points and referred to a considerable amount of factual material upon them, both in the original hearings before the Board · and in later affidavits. Then it made a purely formal claim, giving no factual data at all, but only the bare citation of our Phelps Dodge decision, 2 Cir., 113 F.2d 202, that deductions should be made for willful refusal of other employment; and its draft of an order contained a formal deduction for sums thus lost. As was customary, no hearing was had on these proposals as to the form of our judgment; but on the day following the announcement of Phelps Dodge Corp. v. N. L. R. B., supra, upsetting our order so far as it provided for such deductions, this court entered the Board's order and thus rejected petitioner's counter-order. Obviously, this action was necessary. There had been no showing of a possible ground for the suggested modification. Moreover, as the Supreme Court had just decided, the issue was not for us anyway. Of course, we knew of that decision; it was widely publicized; and such decisions are available to us in full by at least the next day after they are rendered. Thereupon there followed one of the most revealing actions by petitioner which had occurred in the entire proceedings, namely, the filing of a motion for a resettlement of the order on other grounds than that here under discussion.

Had petitioner seriously contemplated pressing the issue of willfullness, its indicated course was naturally to move for a hearing before the Board, on the basis of the Phelps Dodge decision, and with a showing by affidavits, or otherwise, of some facts indicating a reasonable basis for the claim. True, petitioner did now ask for a Board hearing, but only upon the same two issues—its own offers of re-employment and actual earnings—which it has always stressed with extensive supporting data. Gone was any citation to the Phelps Dodge case either in our court or in the Supreme Court. Gone also was any reference of any kind to the willfullness issue. In fact the new proposed counter-order itself contained the Board's provision for making whole the employee by payment of the amounts he would normally have earned, "less his net earnings during said period,"

and left to the Board merely the finding of the amount thus due. Naturally, the Board was correct in saying that these issues, under our precedents, were to be settled in contempt proceedings. Naturally, too, we rejected the counter-order (May 16, 1941). We could have done nothing else without repudiating our well-settled decisions which, so far as we know, are in accord with the Supreme Court's views. See N. L. R. B. v. Acme Air Appliance Co., 2 Cir., 117 F.2d 417, 421 (dealing entirely with offers of re-employment and actual earnings).

The only other reference to the matter, prior to the master's hearing in February, 1942, was in petitioner's long answer of November 14, 1941, to the petition to adjudge it in contempt of this court. In twenty-six typewritten pages, with eight pages of exhibits, it again set forth extensive details bearing on its two main claims. The sole reference to the present matter was at the end where prayer was made that the case be referred to a special master, to determine six questions of fact, of which the fourth was "To what extent have the fourteen men, or any of them, willfully failed or neglected to accept reasonably available employment since August 20, 1937?" I think the afterthought and makeweight character of this claim is clearly manifest.

There seems to be some thought that these statements of petitioner should be viewed somewhat as generalized pleading claims, as, say, general allegations of negligence, and that our court has in some fashion misled petitioner in not picking them up and taking action upon them as a trial court might under the suggested circumstances. This is an unreal analogy. Here we have a proceeding in an appellate court for the reopening of a final judgment and for a remand for further trial to a tribunal which has long since finished its task of adjudication. And going beyond all merely procedural analogies, the vital questions are, first, What did petitioner really hope to prove and feel justified in actually fighting for, and, second, What did the Board and the discharged employees and this court have reason to think petitioner was really striving for, and what actions should we properly have taken in the light of our belief? Actually we did take the only correct course on the basis of what petitioner had then shown us, and I confess, therefore, to not a little surprise and regret at the implication of some sort

of estoppel against this court, which must now affect its decision on the proper policies to be here followed to effectuate the purposes of the Labor Act.

But, if we overlook all this, does petitioner, even now, make a showing of deductions which ought fairly to be made by the Board, not in the adjudication of private rights, but in its public capacity of giving effect to the objectives of the Act, for "not so much the minimization of damages as the healthy policy of promoting production and employment"? Phelps Dodge Corp. v. N. L. R. B., supra [313 U.S. 177, 61 S.Ct. 855, 85 L.Ed. 1271, 133 A.L.R. 1217]. Petitioner does not offer to prove a real equivalence between the former positions of these glass workers, with their important rights of seniority, and the new jobs available in the steel mills or on relief. (Indeed, it attempted also to show that the men had refused to go on relief.) It offers only to show from employment agencies that steel jobs were available and that these men did not seek the help of these agencies, or themselves try, to get these jobs. The majority opinion demonstrates that these cannot be considered fair equivalents; it is hardly conceivable that the Board will so hold. Moreover, the men are said to have relied on the advice of the Board as to their rights; and, as has been indicated, the Board was quite justified in such advice from the course this case had taken, if not from the general situation itself. It will hardly promote production and employment if they are to be let down now at this late date. The Board has already indicated its view of this claim from the detailed reply under oath— made by the Board itself, not by its counsel —to petitioner's answer to the petition for contempt. We cannot claim ignorance of what the Board has already shown it thinks is correct policy under the circumstances. Unless petitioner's able and persistent attorneys can produce something quite new, the entire futility of this new reference is clear. I might add that even without the peculiar facts of this case this result is likely to follow in most similar cases or else the back-pay order—practically the only real deterrent to prevent an employer from committing an unfair labor practice, 50 Yale L. J. 507, 509—must fall into disuse in boom war times.

It is said that this case should not be taken as a precedent with respect to future delayed claims for remand to the Board. I fervently hope this is so, for I do not believe we are doing our own duty in effectuating the policies of the Labor Act by putting a premium on such dilatory proceedings as we have before us here. But I fear that we cannot ourselves limit the effect of what we do, and that others will cite us as holding that the most formal and indirect of legal claims is enough, without actual factual support, and whenever or however made, to take a case back to the Board, years after the event, for a trial of the Phelps Dodge issue. I wonder if the Supreme Court majority really wanted that.

The master here acted promptly and efficiently. That, even so, we find his hearings insufficient and at this late date return the matter to the Board seems to me to add all the more force to the arguments I have previously advanced, N. L. R. B. v. Giannasca, 2 Cir., 119 F.2d 756, 759, 135 A.L.R. 560, that contempt hearings, like other labor hearings, should be initially by the Board, not by some newly constituted and ad hoc court.